## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PHL VARIABLE INSURANCE COMPANY,     )
          )
       Plaintiff/               )
       Counterclaim-Defendant,   )
   v.                         )     C.A. No.  12-312 (RGA)
          )
THE HELENE SMALL INSURANCE TRUST,   )
by and through its trustee,       )
WILMINGTON SAVINGS FUND SOCIETY, FSB,   )
          )
       Defendant/          )
       Counterclaim-Plaintiff.   )
          )

## ANSWER AND COUNTERCLAIMS OF
## DEFENDANT HELENE SMALL INSURANCE TRUST

Defendant the Helene Small Insurance Trust (the "Trust" or "Defendant"), by its undersigned counsel, for its answer to the Complaint of Plaintiff PHL Variable Insurance Company ("Phoenix") dated March 15, 2012 (the "Complaint"), states as follows:

1.     Denies the allegations of paragraph 1 of the Complaint, except admits that Phoenix brought this action seeking to rescind the life insurance policy it issued to the Trust on the life of Helene Small (the "Policy") due to an alleged lack of insurable interest.

2.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 of the Complaint, except admits that Phoenix is licensed to sell insurance in Delaware.

3.     The Trust admits that the Trust is a Delaware statutory trust created and organized pursuant to the Delaware Statutory Trust Act, 12 *Del. C.* §§ 3801, *et seq.*, and avers that the Trust's principal place of business is located at 500 Delaware Ave., Wilmington, DE 19801 and

that its trustee is Wilmington Savings Fund Society, FSB, as successor-in-interest to Christiana Bank & Trust Company.   The Trust denies the remaining allegations of paragraph 3 of the Complaint.

4.      Paragraph 4 of the Complaint states a legal conclusion to which no response is required.  To the extent that paragraph 4 makes factual allegations against Defendant, those allegations are denied.

5.      Paragraph 5 of the Complaint states a legal conclusion to which no response is required.  To the extent that paragraph 5 makes factual allegations against Defendant, those allegations are denied.

6.      Paragraph 6 of the Complaint states a legal conclusion to which no response is required.  To the extent that paragraph 6 makes factual allegations against Defendant, those allegations are denied.

7.      Paragraph 7 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.  To the extent paragraph 7 contains allegations directed to Defendant, those allegations are denied.

8.      Paragraph 8 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.  To the extent paragraph 8 contains allegations directed to Defendant, those allegations are denied.

9.     Paragraph 9 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.   To the extent paragraph 9 contains allegations directed to Defendant, those allegations are denied.

10.     Paragraph 10 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.   To the extent paragraph 10 contains allegations directed to Defendant, those allegations are denied.

11.     Paragraph 11 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.   To the extent paragraph 11 contains allegations directed to Defendant, those allegations are denied.

12.     Denies the allegations of paragraph 12 of the Complaint.

13.     Denies the allegations of paragraph 13 of the Complaint.

14.     Denies the allegations of paragraph 14 of the Complaint.

15.     Denies the allegations of paragraph 15 of the Complaint, except admits that Phoenix is attempting to rescind the Policy.

16.     The Trust admits that Phoenix issues life insurance policies and is licensed to do so in Delaware and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 16 of the Complaint.

17.     The Trust admits that Mrs. Small and the Trust applied for a life insurance policy on Mrs. Small's life from Phoenix on or about December 22, 2006 and that the proposed owner and beneficiary of the Policy was the Trust.  The Trust denies the remaining allegations of paragraph 17 of the Complaint and refers to the application for its complete contents.

18.     Denies the allegations of paragraph 18 of the Complaint and avers, based on information and belief, that:  (i) Phoenix did not rely on the answers stated on the Application; (ii) Phoenix did not consider these matters material to underwriting the Policy; (iii) all such answers were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust; and (iv) any claim by Phoenix based on purported misrepresentations is barred by the incontestability provision in the Policy, which is required by 18 *Del. C.* § 2908.

19.     Denies the allegations of paragraph 19 of the Complaint, refers to the Application for its complete contents, and avers, based on information and belief, that:  (i) Phoenix did not rely on the answers stated on the Application; (ii) Phoenix did not consider these matters material to underwriting the Policy; (iii) all such answers were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust; and (iv) any claim by Phoenix based on purported misrepresentations is barred by the incontestability provision in the Policy, which is required by 18 *Del. C.* § 2908.

20.     Denies the allegations of paragraph 20 of the Complaint, refers to the Application for its complete contents, and avers on information and belief that the answers in the Application were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust.

21.     Denies the allegations of paragraph 21 of the Complaint, refers to the Client Intent Form for its complete contents, and avers, based on information and belief, that:  (i) Phoenix did

not rely on the answers stated on the Statement of Client Intent Form and did not attach it to the Policy when issued; (ii) Phoenix did not consider these matters material to underwriting the Policy; (iii) all such answers were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust; and (iv) any claim by Phoenix based on purported misrepresentations is barred by the incontestability provision in the Policy, which is required by 18 *Del. C.* § 2908.

22.     Denies the allegations of paragraph 22 of the Complaint, refers to the Statement of Client Intent Form for its complete contents, and avers on information and belief that the answers in the Statement of Client Intent Form were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust.

23.     Denies the allegations of paragraph 23 of the Complaint, except admits that Phoenix issued the $10,000,000 Policy to the Trust with a policy date of March 20, 2007 and refers to the Policy for its complete contents.

24.     Denies the allegations of paragraph 24 of the Complaint, except admits on information and belief that the first premium payment was made to Phoenix and that the Policy was delivered to the Trust in Delaware, and refers to the policy acceptance form for its complete contents.

25.     Denies the allegations of paragraph 25 of the Complaint to the extent directed at the Trust, denies knowledge or information sufficient to form a belief as to the remaining allegations, and avers that any misrepresentations were made by Phoenix's own agents.

26.     Denies the allegations of paragraph 26 of the Complaint to the extent directed at the Trust, denies knowledge or information sufficient to form a belief as to the remaining allegations, and avers that any misrepresentations were made by Phoenix's own agents.

27.     Denies the allegations of paragraph 27 of the Complaint.

28.     Denies the allegations of paragraph 28 of the Complaint.

29.     Denies the allegations of paragraph 29 of the Complaint.

30.     Denies the allegations of paragraph 30 of the Complaint.

31.     Denies the allegations of paragraph 31 of the Complaint.

32.     Denies the allegations of paragraph 32 of the Complaint.

33.     Denies the allegations of paragraph 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion to which no response is required.  To the extent that paragraph 34 makes factual allegations against Defendant, those allegations are denied.

### Count I

### Declaratory Judgment Lack Of Insurable Interest

35.     Repeats the above responses in paragraphs 1 through 34 and incorporates those responses herein by reference as if set forth at length.

36.     Denies the allegations of paragraph 36 of the Complaint.

37.     The Trust denies that Phoenix has fully and unconditionally tendered all premiums to the Court as it purports to do in paragraph 37 given that in the very next paragraph Phoenix seeks to retain the premiums, and avers that if Phoenix succeeds in rescinding the Policy and/or having it declared void, Phoenix will be obligated to refund all premiums both as a matter of Delaware law and pursuant to explicit language in Section 21 of the Policy providing that Phoenix must return all premiums, plus interest, in the event that it contests the Policy.

38.    Denies that Phoenix is entitled to retain any premiums and avers that if Phoenix succeeds in rescinding the Policy and/or having it declared void, Phoenix will be obligated to refund all premiums, plus interest.

## FIRST DEFENSE
## (FAILURE TO STATE A CLAIM)

39.    The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE
## (STATUTE OF LIMITATIONS)

40.    Phoenix's claim to rescind or void the Policy, and its claim to retain premiums, is barred by 10 *Del. C.* § 8106 because Phoenix brought this action more than three years after the Policy was issued.

## THIRD DEFENSE
## (INCONTESTABILITY)

41.    To the extent Phoenix's claims are predicated on alleged misrepresentations, they are barred by 18 *Del. C.* § 2908.

## FOURTH DEFENSE
## (UNCLEAN HANDS)

42.    The insurance agents who procured the Policy were agents of Phoenix.

43.    Phoenix is responsible for the acts of its agents that fall within the agents' actual or apparent authority, and cannot rescind, cancel or void the Policy which the agents procured, or otherwise deny benefits under that Policy, based upon acts of or knowledge by the agents.

44.    Phoenix's conduct in selling the Policy and other similar policies precludes it from seeking to rescind the Policy.

## FIFTH DEFENSE
## (WAIVER AND ESTOPPEL)

45.     Phoenix has waived its right to rescind the Policy because the allegations on which it seeks to rescind the Policy involve alleged acts done by its own agents in the application process which it ratified by issuing the Policy.

46.     Phoenix should be estopped from seeking to rescind the Policy because the alleged acts upon which it seeks to rescind the Policy were either done by its own agents or with the agents' knowledge, which is imputed to Phoenix, and the Trust relied on the issuance of the Policy by Phoenix in its activities and in not seeking other insurance.

47.     Phoenix has waived its right to rescind, void, or invalidate the Policy, and/or should be estopped from doing so, because: (i) Phoenix waited an unreasonable and excessive period of time after learning of the purported facts and circumstances on which it later purported to contest the Policy; (ii) Phoenix continued to accept premium payments and treat the Policy as enforceable and in force after it had gained knowledge of its purported grounds for contesting the Policy; and (iii) Phoenix engaged in this unreasonable delay for its own financial reasons.

## SIXTH DEFENSE
## (INSURABLE INTEREST UNDER DELAWARE STATUTE)

48.     Under Delaware law, an insurable interest existed at policy inception and, therefore, Phoenix cannot rescind or cancel the Policy for lack of insurable interest.

## SEVENTH DEFENSE
## (OBLIGATION TO REFUND PREMIUMS)

49.     In the event that Phoenix succeeds in rescinding or voiding the Policy, Phoenix is required both by Delaware law and the terms of the Policy to return all premiums, plus interest, paid for the Policy to the Trust.

WHEREFORE, Defendant prays that the Court enter judgment ordering as follows:

A.      Dismissing the Complaint with prejudice and in its entirety;

B.      Adjudicating and declaring that Phoenix's purported rescission or cancellation of the Policy is unlawful and improper and that the Policy remains in full force and effect;

C.      Granting Defendant its costs of suit, expenses, and attorney's fees expended and incurred herein, with post and pre-judgment interest; and

D.      Granting Defendant such other and further relief as the Court deems just and appropriate.

## COUNTERCLAIMS

50.     The counterclaim alleged below seeks a declaration that PHL Variable Insurance Company ("Phoenix" or "Counterclaim-Defendant") cannot rescind or invalidate the life insurance policy (the "Policy") it issued to the Helene Small Insurance Trust (the "Trust" or "Counterclaim-Plaintiff") because (1) Phoenix's attempt to rescind or void the Policy is barred by the statute of limitations; (2) Phoenix has waived any purported right to rescind or void the Policy, and/or should be estopped from rescinding or voiding the Policy, based on its own conduct and the conduct of its agents; and (3) Phoenix's own unclean hands bar it from rescinding or voiding the Policy. The Trust also seeks a declaration that Phoenix's actions in seeking to rescind the Policy are improper, unlawful, and were done in bad faith, and that the Policy is valid and enforceable and the Trust should receive its costs, fees, and expenses. The Trust further seeks a declaration that, prior to improperly seeking to rescind the Policy, Phoenix improperly raised the cost of insurance for the Policy and must not only honor the Policy but honor its terms as well, by lowering the cost of insurance charges to what was promised in the

Policy. Additionally, the Trust, in the alternative, seeks a declaration that in the event Phoenix succeeds in rescinding or voiding the Policy, Phoenix is obligated to return all premiums paid for the Policy to the Trust.

## THE PARTIES

51.     The Trust is a statutory trust created and organized pursuant to the laws of the State of Delaware and formed pursuant to the Delaware Statutory Trust Act, *12 Del. C.* §§ 3801, *et seq.*, with its principal place of business located at 500 Delaware Ave., Wilmington, DE 19801.  As a Delaware statutory trust, the Trust is a separate legal entity under 12 *Del. C.* § 3801(g) and is empowered under 12 *Del. C.* § 3804 to sue in its own name.  Helene Small established the Trust for the purpose of purchasing and maintaining a life insurance policy on her life.

52.     Upon information and belief, and based on its own Complaint, Phoenix is a corporation organized under the laws of the State of Connecticut, with its principal place of business located in Hartford, Connecticut.  Phoenix is licensed to do business in the State of Delaware.  Upon information and belief, Phoenix is a wholly owned subsidiary of PM Holdings, Inc., which is a wholly owned subsidiary of Phoenix Life Insurance Company (when discussing the general business activities of "Phoenix," these counterclaims refer to both PHL Variable Insurance Company and Phoenix Life Insurance Company, collectively, as "Phoenix"). Phoenix Life Insurance Company is a wholly owned subsidiary of the Phoenix Insurance Companies, Inc., which became a publicly traded entity in 2001 and trades under the symbol "PNX."

## JURISDICTION AND VENUE

53.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the complete diversity of citizenship between Counterclaim-Plaintiff and Counterclaim-

Defendant and because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

54.     This Court has personal jurisdiction over the Counterclaim-Defendant, as among other reasons, it issued insurance coverage in Delaware to a Delaware policy owner and beneficiary. It also has made continuous and systematic contacts with Delaware, and is licensed as an insurer in the State of Delaware.

55.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred in this District and the Policy that is the subject of this action was issued in this District, such that the property that is the subject of this action is situated in this District.

## NATURE OF THE ACTION

56.     This action arises out of the attempt by Phoenix to rescind a valid life insurance policy it issued to the Trust by alleging erroneously that such Policy constitutes purportedly improper stranger-owned life insurance ("STOLI") when, in fact, Phoenix has attempted to rescind the Policy solely to avoid paying the $10,000,000 benefit due under the Policy and because of Phoenix's own dire financial situation.

57.     The Policy was procured by Helene Small and issued to the Trust, which she established. Thus the Policy complies with Delaware's insurable interest statute. 18 *Del. C.* § 2704. Mrs. Small later, as was her right under Delaware law, which provides that life insurance policies are freely assignable, sold the beneficial interest in the Trust. This sale was not part of any prearranged agreement before the Policy was issued but was rather an arms-length transaction initiated and consummated by the parties after the Policy was issued.

58.     Phoenix's purported concern about the Policy being STOLI is not only factually incorrect, as described above, but it is contradicted by Phoenix's own actions. Initially, Phoenix

fully embraced the sale of policies to investors (the "secondary market" for policies), which it now criticizes and uses as a pretext for attempting to rescind policies. For years, Phoenix issued policies it knew would be resold in the secondary market in order to boost its short term profits and actively encouraged its agents to seek out such business. Phoenix also extensively marketed large face value policies to elderly insureds like Mrs. Small in order to collect as much premium income as possible as fast as possible. It did so knowing that many such insureds were considering whether to sell their policies or interests in their policies to investors on the secondary market. Phoenix's parent company also became an active buyer of policies on the secondary market and even formed a subsidiary dedicated to the purchase of policies on the secondary market. Phoenix was thus an active, willing, and aggressive participant in the secondary market for years.

59. Now, however, due to its own dire financial situation, and its concern that it will be unable to meet its contractual obligations as they become due and survive as a company, Phoenix has reversed its position regarding the secondary market, which it previously embraced, routinely denying coverage under policies or seeking to rescind policies its customers sold to investors on the pretextual ground that the policies it knowingly sold violate applicable insurable interest laws. Phoenix has engaged in this practice not because of any legitimate concern regarding the policies, which it happily sold, but because it has found itself in substantial financial trouble due to its involvement in substantial and reckless investments. As a consequence of these problems of its own creation, Phoenix has been under intense pressure to expunge unprofitable, large face amount insurance policies from its books and to avoid paying claims on such policies. Phoenix's changed financial circumstances, and not any legitimate

concern regarding the Policy's legitimacy, motivated Phoenix's improper attempt to rescind the Policy in this case.

60.     As a result of its financial trouble, Phoenix has begun to "wage war" on investors who purchased Phoenix policies on the secondary market in an attempt to intimidate them into lapsing their policies (so that Phoenix can reap a windfall) or convince them to accept less than the full benefits promised by Phoenix in its policies.

61.     As one example, in 2010, Phoenix impermissibly attempted to raise the cost of insurance ("COI") for certain life insurance policies it previously issued, including the Policy at issue here, because it believed many of the policies had been sold to investors.  The New York Insurance Department ordered Phoenix to reverse these impermissible rate increases. Unperturbed, Phoenix has proceeded to again impermissibly raise the COI for these same policies, including the Policy at issue here, in 2011.  Phoenix's increasing of the COI for the Policy and other policies, both in 2010 and 2011, was a willful and unjustified breach of Phoenix's contracts with its policy owners.

62.     As another example of Phoenix's misconduct towards investors, Phoenix routinely denies requests to change the ownership of policies it issued, even though the policies explicitly provide that ownership may be changed at any time.  Numerous policyholders, holding hundreds of millions of dollars in Phoenix policies, have been forced to sue Phoenix over this willful breach of Phoenix's contractual promises.

63.     As another part of its attacks on investors, and as a result of its own financial troubles, Phoenix has also begun to engage in a deceptive practice, sometimes called "post-issuance underwriting" with respect to policies it no longer views as profitable.  In other words, when it is actually called upon to pay a death benefit by a third party owner or otherwise

concludes that a policy is unprofitable to it, Phoenix purports to "rescind" the policies unilaterally based on facts it was either aware of, or did not care about, at the time the policies were sold. Such *post hoc* underwriting is universally recognized as constituting insurance "bad faith." Phoenix's reputation for engaging in this unlawful conduct has become widely known in the insurance industry. Indeed, the Wall Street Journal recently reported that while most life insurance companies deny less than one percent of death claims, Phoenix denies more than seven percent. These unlawful claims practices by Phoenix have increased in recent months. Indeed, in a brazen display of misconduct and in an effort to intimidate its policyholders, Phoenix has begun denying claims submitted by parties who previously challenged its unlawful COI increases as retaliation for those parties standing up against Phoenix's mistreatment of its policyholders.

64. As a further part of its attack on investors, Phoenix has begun filing rescission actions seeking to avoid policies it issued four, five, or even six years ago, and alleging that it should be entitled to keep the premiums which it happily collected for numerous years from those policyholders. This misconduct by Phoenix is particularly egregious given that its policies expressly provide that it must return all premiums in the event that it contests a policy. That is what Phoenix has done in this case. After collecting premiums from the Trust for six years, Phoenix now belatedly contends that it was tricked into issuing the Policy and should not only be permitted to get out of the contract but should be able to keep the premiums. This is not an isolated instance of bad faith on Phoenix's part. Indeed, the same day it filed this action, Phoenix filed six other actions in this District alone seeking to rescind policies and keep the premiums. Phoenix has filed numerous similar actions throughout the country.

65.    By filing separate actions around the country seeking to rescind policies, Phoenix attempts to persuade courts that it was tricked into issuing the particular policy at issue, while hiding the vast scale of the policies Phoenix claims to have unknowingly issued.  But as set forth below, Phoenix was not tricked into doing anything.  The policies Phoenix now complains about in its various rescission actions were in fact Phoenix's core business for years.  Those policies were what enriched Phoenix's executives and sales force, and what made up the majority of Phoenix's business, and Phoenix cannot now claim with a straight face that it did not willingly, knowingly and happily issue policies it knew would potentially be sold to investors.

### Life Insurance Sold to Investors and the
### Eager Participation of Phoenix in that Market

66.    For decades, the life insurance industry has had to pay out relatively few death claims because the majority of life insurance policies lapse (*i.e.*, the policy owner ceases paying premiums) before the insured's death.  This occurs because, after owning a policy for some amount of time, most insureds find themselves in a position in which they are no longer able – or no longer desire – to continue to pay premiums.  Before the development of the "secondary market" for life insurance policies, such insureds were faced with little option and generally chose to surrender their insurance policy, thus relinquishing a potentially valuable asset for little or no payment from the insurer.  This state of affairs resulted in a tremendous windfall to insurers, as they were able to retain premiums paid by all policy owners while only infrequently paying out death benefits.

67.    The secondary market for life insurance policies developed as a direct response to this imbalance of power between insurers and their insureds that resulted in most insureds surrendering their policies, and thereby abandoning months – or years – of premiums previously paid to the insurer.  Investors who purchase insurance policies from insureds in the secondary

-15-

market provide the insureds with the option of selling their insurance policies to the investor rather than simply surrendering the policy to the insurer. According to a recent GAO report, policy owners who sold their policies on the secondary market received approximately eight times the cash surrender value that they could have otherwise received from their insurers. Although some insurers, as a scare tactic, have characterized this secondary market for life insurance policies as "wagering on human life", the secondary market provides an important service to insureds who are now able to sell a valuable asset (their paid for insurance policy) rather than simply allowing the policy to lapse to the insurer's great benefit.

68.     Insureds often form insurance trusts for the purpose of owning insurance policies on their lives and name themselves or family members as the beneficiaries of such insurance trusts. When policies are owned by insurance trusts, the insureds and their families also have the option of later selling their interests in those trusts, as opposed to the policies themselves, to investors on the secondary market if they wish. That is what Helene Small did in this case.

69.     Although the secondary market for life insurance policies plainly benefits insureds, some life insurers have taken a negative view of the secondary market because of its perceived impact on historical life insurance policy lapse rates. An investor who buys a policy on the secondary market or who purchases a policy directly from the insurer on an insured's life is unlikely to allow the policy to lapse. Thus, when a policy is sold to an investor, the insurer is likely to have to pay the death benefit. Insurers who dislike the secondary market dislike it because it ensures that they will have to do precisely what they promise in the insurance policies they issue – ultimately pay out insurance benefits for which they have received a premium.

70.     Upon information and belief, in or around 2004-2005, the life insurance industry began to experience significant growth in the marketing and sale of high face amount policies for

high net worth elderly individuals. Upon information and belief, this growth was largely attributable to the expansion in the secondary market for life insurance. The knowledge that a policy could potentially be sold for a profit, rather than lapsed or surrendered to the insurance company, led many seniors to purchase policies as an investment that could potentially benefit their family if they decided they no longer wished to keep the policy. That the increased demand for high face amount policies was driven by the secondary market was commented upon frequently within the insurance industry and was well known to all major life insurers. That many insureds were forming trusts to own insurance policies on their lives, with the possibility that the beneficial interest in the trusts would later be sold, was also well known and frequently discussed in the insurance industry during this time as well.

71. This increased demand for large face amount policies on the lives of seniors, which had a high possibility of later being sold to a third party on the secondary market, provided an opportunity for significant revenue for insurers wishing to sell such policies. Because such policies were unlikely to lapse, however, certain insurers determined that they did not believe such policies would ultimately be profitable and decided not to sell such policies. Indeed, as early as 2005, certain life insurers had already developed pejorative terms, such as STOLI, to describe life insurance policies which they believed were being procured for the purpose of resale to investors.

72. Other insurers, however, eager to obtain a share of the premium revenue from the increased demand for high face amount policies, actively embraced the secondary market and the transactions that led to this increased demand. Phoenix was one of the companies which most eagerly embraced the new potential revenue available as a result of the secondary market.

### Phoenix's Sale of (and purchase of)
### Life Insurance Policies as an Investment

73.     Upon information and belief, Phoenix was not actually concerned whether or not the policies it would issue were likely to be sold into the secondary market after issuance. To the contrary, upon information and belief, because Phoenix wanted to increase its premium revenue, Phoenix actively solicited insurance agents and other producers to offer life insurance products that were likely to be sold into the secondary market. Phoenix was concerned only with generating as much premium revenue as possible through the sale of expensive life insurance policies on the lives of elderly individuals.

74.     Upon information and belief, during the years prior to 2005, Phoenix's life insurance business had been on the decline. Upon information and belief, Phoenix, in 2005, began a concerted effort to reverse this trend by attempting to become a leader in the sale of high face amount policies to wealthy, elderly insureds, which were likely to be sold to investors.

75.     During the time period from 2005 to 2007, Phoenix engaged in an aggressive campaign to sell high face amount policies to elderly insureds in order to generate high premium revenue. Upon information and belief, Phoenix even encouraged its agents to ask elderly insureds to purchase even larger policies than they had initially applied for so as to increase the premium revenue paid to Phoenix. Upon information and belief, Phoenix's products were priced such, and issued in such large face amounts (often at Phoenix's urging), that resale of the policies was virtually inevitable.

76.     In its efforts to maximize the receipt of premium income by issuing as many of these high-dollar policies as possible, Phoenix, on information and belief, relaxed or disregarded its own underwriting guidelines, disregarded any issues or "red flags" raised in the underwriting process, did not seek information that it now contends, after the fact, to be material, and

-18-

otherwise knowingly engaged in "cash flow underwriting." Upon information and belief, Phoenix's "aggressive underwriting" was even commented on by financial analysts, who noted that Phoenix was likely approving policies its competitors would not in order to compensate for Phoenix's comparably low financial ratings.

77. The policies issued by Phoenix at the relevant time made clear its willingness to sell policies to insureds who planned to ultimately sell their policies into the secondary market. The policies issued by Phoenix specifically provided that the owner of the policy could (1) change ownership of the policy; (2) change the beneficiary of the policy; and (3) assign the policy. Delaware's insurance code provides that policies can be freely assigned subject to restrictions in the insurance contract itself. Phoenix chose not to restrict the sale of its policies, however, and even provided itself with a right of first refusal since it was also a buyer of policies on the secondary market.

78. Upon information and belief, as a result of Phoenix's embracement of the secondary market, its life insurance sales increased significantly in 2005. Upon information and belief, Phoenix's sales of life insurance policies continued to expand dramatically into 2006, which Phoenix acknowledged was a direct result of it having accepted significant amounts of one form of business which it now characterizes as STOLI: namely, non-recourse premium financing. Indeed, on information and belief, even after many of its competitors denounced non-recourse premium financing as STOLI, Phoenix continued accepting such business and, even after deciding to stop accepting future non-recourse business, Phoenix "grandfathered" significant amounts of pending non-recourse business so as to be able to gain the significant premiums from the pending business and boost Phoenix's own financial position. Although Phoenix ultimately ceased accepting non-recourse premium financing business, it continued to

actively seek and accept other applications for policies which it believed were likely to be sold to investors.

79.     Upon information and belief, the majority of premium revenue Phoenix earned during the 2005-2007 time period came from policies which were later sold to investors or were owned by entities in which investors later purchased interests. Indeed, on information and belief, in some instances, Phoenix sold as much as $260 million in such policies through a single agent.

80.     Phoenix's participation in the secondary market for life insurance extends far beyond actively promoting and soliciting life insurance policies which it knew were likely to be sold to third parties on the secondary market. In 2007, Phoenix's parent even formed a subsidiary to purchase life settlements. Phoenix's assertions regarding "wagering" are thus hypocritical, as Phoenix itself has been a purchaser of policies on the secondary market.

### Phoenix's Issuance of The Policy To The Trust

81.     On or about December 21, 2006, Helene Small established the Trust to own a life insurance policy on her life. Christiana Bank & Trust Company was appointed to serve as the Trustee of the Trust. On December 3, 2010, Christiana Bank & Trust Company merged with Wilmington Savings Fund Society, FSB, which is now the successor-in-interest to Christiana Bank & Trust Company as Trustee of the Trust.

82.     On or about December 22, 2006, an application for the life insurance policy to be issued to the Trust (the "Application") was executed.

83.     In the Application, Helene Small was identified as the "Proposed Insured." The Trust was identified in the Application as the owner of the Policy. The Trust was also identified as the sole beneficiary of the Policy in the Application.

84.     In exchange for the agreement to pay premiums and other consideration, Phoenix subsequently issued and delivered the Policy to the Trust. The initial face amount of the Policy is $10,000,000. The Policy Specifications state that the "Owner, Beneficiary" is identified in the Application, which listed the Trust as the proposed owner and beneficiary. The Trust remains both the Policy owner and beneficiary. The Policy's "Issue Date" was March 20, 2007.

85.     Section 21 of the Policy expressly provides: "If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the contested face amount or the sum of any Monthly Deductions made under this policy for the contested face amount."

86.     All premiums due under the Policy to date have been paid in accordance with the terms of the Policy, and Counterclaim-Plaintiff has duly performed all other conditions of the Policy on its part.

### Phoenix's Motivation to Wrongfully and Unjustifiably Attempt to Rescind the Policy

87.     Since issuing the Policy, Phoenix has found itself in substantially different economic conditions. These changed conditions, and Phoenix's desire to avoid paying death benefits and thus further worsen its financial condition and to remove large policies from its books so that it can reduce its reserves, and not any actual concern over the Policy's legitimacy, are the impetus for Phoenix's purported rescission of the Policy.

88.     Phoenix and its parent The Phoenix Companies, Inc. (the "Phoenix Companies") suffered significant financial losses during the 2008-09 financial crisis. The Phoenix Companies suffered a net loss of approximately $726 million in 2008; were downgraded by the ratings agencies to "junk" bond range; were forced to fire a substantial portion of their workforce; and

lost their biggest distributors in early 2009 (because they were no longer able to sell Phoenix products). The Phoenix Companies' stock, which had traded at over $15 a share during much of 2007 plummeted to as low as 21 cents a share in 2009.

89.     To address its financial concerns and lapse rate concerns, Phoenix has made a concerted effort to avoid having to honor the policies it issued which its customers later sold to investors on the secondary market. As part of this strategy, in 2010, Phoenix increased its COI rates for a block of policies, including this Policy, which it believed were likely to have been sold to investors. In its 10-K, Phoenix specifically admitted that this increase in prices was being made due to its belief that many of the policies in the block were what Phoenix considers STOLI. By increasing the COI charges, Phoenix hoped to make the policies unprofitable to investors and force them to lapse their policies. The problem for Phoenix is that the terms of its policies do not permit cost of insurance increases except for specifically defined circumstances which do not include Phoenix wishing to punish investors for buying its policies. Therefore, on information and belief, the New York Insurance Department ordered Phoenix to reverse its impermissible rate increases and multiple lawsuits, including a class action, have been filed against Phoenix regarding Phoenix's improper COI increases.

90.     Another part of Phoenix's strategy for avoiding paying claims on policies sold to investors is to deny claims for coverage in instances in which the policy or an interest in the policy owner has been sold and purport to rescind such policies, and other policies it views as being unprofitable, as being STOLI. Upon information and belief, actually paying claims as promised in Phoenix's policies would present a significant strain on Phoenix's already dire financial situation. Thus, apparently believing that desperate times call for desperate measures, Phoenix has, on information and belief, decided to reject claims for payments on large face

amount policies owned by third parties as a routine matter and to accuse such policies of violating insurable interest laws in the hopes that it can avoid having to meet its contractual obligations. It has also engaged in an effort to rid itself of other large policies which it views as being unprofitable, and the substantial reserves required for such policies, by purporting to rescind such policies as STOLI. To increase the windfall to itself, Phoenix takes the position that not only can it rescind policies years after they were issued but that it can also keep the premiums paid for the policies.

### Phoenix's Wrongful and Unjustified Attempt to Rescind the Policy

91.     Phoenix filed this action on March 15, 2012 – six years after issuing the Policy – and did not previously contest the Policy. Because Phoenix did not contest the Policy within three years its claim is barred by Delaware's statute of limitations.

92.     Upon information and belief, Phoenix actively and purposefully marketed, solicited, and encouraged the sale by its agents of life insurance policies for investment purposes and so-called STOLI to generate cash flow, premium income, and incentive compensation for Phoenix's senior officers. These efforts were extremely successful. Upon information and belief, during 2005-2007, the majority of business Phoenix received from its top agents consisted of what it now characterizes as being "STOLI." This was no accident but rather a result of a concerted effort of Phoenix's sales force to boost revenue.

93.     Upon information and belief, this action by Phoenix to rescind the Policy is not motivated by any interest in protecting the insured from investors having an interest in the early death of the insured or concern about STOLI. Upon information and belief, Phoenix's sole motivation in seeking to rescind this Policy and other policies sold to investors is to purge its inventory of policies held by owners who will not default on the premium payments or allow

coverage to lapse and to avoid paying claims which will further weaken its already attenuated financial position. This action to rescind a valid contract was motivated solely by pecuniary gain. Upon information and belief, Phoenix's attempt to void the Policy after the fact constitutes improper retrospective underwriting done for illegitimate reasons related to Phoenix's financial condition.

94.     Phoenix's attempt to rescind or cancel the Policy is unjustified and unlawful. The Policy issued to the Trust remains in full force and effect. Further, in the event that Phoenix were successful in rescinding or voiding the Policy, both Delaware law and the terms of the Policy itself would require that it return all premiums to the Trust. Its attempt to retain premiums, like its attempt to rescind, is thus unlawful and improper.

**COUNT I**

**DECLARATORY JUDGMENT**

95.     Counterclaim-Plaintiff the Trust realleges and incorporates by reference each of the allegations made at paragraphs 1 through 94, inclusive.

96.     This is a claim for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202. Counterclaim-Plaintiff seeks a judicial determination of the rights, duties and obligations of the parties with respect to an actual controversy arising in connection with the Policy.

97.     Phoenix in this action seeks to rescind the Policy by having it declared void *ab initio* for lack of an insurable interest.

98.     The Trust seeks a declaration that there is no basis for rescission of the Policy and seeks to have it declared in full force and effect to provide insurance coverage on the life of Helene Small and to have Phoenix's actions in seeking to rescind the Policy declared improper, unlawful, and done in bad faith.

99.     The Trust further seeks declarations that Phoenix's attempt to rescind or void the Policy is barred by the statute of limitations, that Phoenix has waived any right to rescind or void the Policy and/or is estopped from rescinding or voiding the Policy based on its own conduct, and that Phoenix's own unclean hands bar it from rescinding or voiding the Policy.

100.    The Trust also seeks a declaration that Phoenix has improperly raised the cost of insurance charges for the Policy, in violation of the Policy's terms, and must reduce the charges and pay the Trust all damages incurred as a result of the improper charges.

101.    The Trust also, in the alternative, seeks a declaration that if Phoenix is successful in rescinding or voiding the Policy, it must return all premiums paid for the Policy to the Trust, plus interest.

102.    Accordingly, an actual case or controversy exists among the parties.

103.    A declaration that Phoenix is barred from challenging the Policy for the various reasons asserted by the Trust, that the Policy is enforceable, that Phoenix has acted improperly in seeking to rescind the Policy, that the increases in the cost of insurance charges made by Phoenix were improper, and that phoenix must return all premiums in the event the Policy is rescinded or declared void, is necessary and proper at this time in order that all parties may determine their rights and obligations among themselves.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim-Plaintiff prays that the Court enter judgment ordering as follows:

A.      Adjudicating and declaring that Phoenix's attempt to rescind or void the Policy is barred by the statute of limitations, that Phoenix has waived any right to rescind or void the Policy and/or is estopped from rescinding or voiding the Policy based on its own conduct,

and that Phoenix's own unclean hands bar it from rescinding or voiding the Policy.

        B.     Adjudicating and declaring that Phoenix's purported rescission or cancellation of the Policy is unlawful and improper and that the Policy remains valid and enforceable;

        C.     Adjudicating and declaring that Phoenix has improperly raised the cost of insurance charges for the Policy, in violation of the Policy's terms, and must reduce the charges and pay the Trust all damages incurred as a result of the improper charges;

        D.     Adjudicating and declaring, in the alternative, that if Phoenix is successful in rescinding or voiding the Policy, Phoenix must return all premiums, plus interest, paid for the Policy to the Trust.

        E.     Granting Counterclaim-Plaintiff compensatory damages for the cost of insurance increases, costs of suit, expenses, and attorneys' fees expended and incurred herein, with post and pre-judgment interest; and

        F.     Granting Counterclaim-Plaintiff such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

OF COUNSEL:                          POTTER ANDERSON & CORROON LLP

John E. Failla                       By:   /s/ John E. James
Elise A. Yablonski                         John E. James (No. 996)
Nathan Lander                              David E. Moore (No. 3983)
PROSKAUER ROSE LLP                         Michael B. Rush (No. 5061)
11 Times Square                            Hercules Plaza - 6th Floor
New York, NY  10036                        1313 North Market Street
Telephone:  (212) 969-3000                 Wilmington, DE  19801
                                           Telephone:  (302) 984-6000
                                           E-Mail:  jjames@potteranderson.com
                                                    dmoore@potteranderson.com
                                                    mrush@potteranderson.com

                                     *Attorneys for Defendant*
                                     *Helene Small Insurance Trust,*
                                     *by and through its Trustee*
                                     *Wilmington Savings Fund Society, FSB*

Dated: May 4, 2012
1057976/38946

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, John E. James, hereby certify that on May 4, 2012, the attached document was electronically filed with the Clerk of the Court using CM/ECF, which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

Richard Douglas Heins
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue – 8th Floor
Wilmington, DE  19801
E-Mail:  rheins@asgby-geddes.com
              tlydon@ashby-geddes.com

*Attorneys for Plaintiff*

*/s/ John E. James*
John E. James
David E. Moore
Michael B. Rush
POTTER ANDERSON & CORROON LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
(302) 984-6000
jjames@potteranderson.com
dmoore@potteranderson.com
mrush@potteranderson.com