**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PHL VARIABLE INSURANCE COMPANY, )
                                    )
                                    )
        Plaintiff and Counterclaim-Defendant, )
                                    )     C.A. No.  12-312 (RGA)
                                    )
      v.                                )
                                    )
THE HELENE SMALL INSURANCE       )
TRUST, by and through its trustee,      )
WILMINGTON SAVINGS FUND SOCIETY, )
FSB,                                 )
        Defendant and Counterclaim-Plaintiff. )

**FIRST AMENDED ANSWER AND COUNTERCLAIMS OF
DEFENDANT HELENE SMALL INSURANCE TRUST**

Defendant the Helene Small Insurance Trust (the "Trust" or "Defendant") by its undersigned counsel, for its first amended answer to the Complaint of PHL Variable Insurance Company ("Phoenix") dated March 15, 2012 (the "Complaint"), states as follows:

1.      Denies the allegations of paragraph 1 of the Complaint, except admits that Phoenix brought this action seeking to rescind the life insurance policy it issued to the Trust on the life of Helene Small (the "Policy") due to an alleged lack of insurable interest.

2.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 of the Complaint, except admits that Phoenix is licensed to sell insurance in Delaware.

3.      The Trust admits that the Trust is a Delaware statutory trust created and organized pursuant to the Delaware Statutory Trust Act, 12 *Del. C.* §§ 3801, *et seq.*, and avers that the Trust's principal place of business is located at 500 Delaware Ave., Wilmington, DE 19801 and that its trustee is Wilmington Savings Fund Society, FSB, as successor-in-interest to Christiana

Bank & Trust Company.   The Trust denies the remaining allegations of paragraph 3 of the Complaint.

4.      Paragraph 4 of the Complaint states a legal conclusion to which no response is required.   To the extent that paragraph 4 makes factual allegations against Defendant, those allegations are denied.

5.      Paragraph 5 of the Complaint states a legal conclusion to which no response is required.   To the extent that paragraph 5 makes factual allegations against Defendant, those allegations are denied.

6.      Paragraph 6 of the Complaint states a legal conclusion to which no response is required.   To the extent that paragraph 6 makes factual allegations against Defendant, those allegations are denied.

7.      Paragraph 7 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.   To the extent paragraph 7 contains allegations directed to Defendant, those allegations are denied.

8.      Paragraph 8 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.   To the extent paragraph 8 contains allegations directed to Defendant, those allegations are denied.

9.      Paragraph 9 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or

information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.  To the extent paragraph 9 contains allegations directed to Defendant, those allegations are denied.

10.     Paragraph 10 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.  To the extent paragraph 10 contains allegations directed to Defendant, those allegations are denied.

11.     Paragraph 11 of the Complaint contains allegations of law or statements of a general nature that are not directed to Defendant and Defendant therefore lacks knowledge or information sufficient to admit or deny such allegations of a general nature and no response is required to allegations of law.  To the extent paragraph 11 contains allegations directed to Defendant, those allegations are denied.

12.     Denies the allegations of paragraph 12 of the Complaint.

13.     Denies the allegations of paragraph 13 of the Complaint.

14.     Denies the allegations of paragraph 14 of the Complaint.

15.     Denies the allegations of paragraph 15 of the Complaint, except admits that Phoenix is attempting to rescind the Policy.

16.     The Trust admits that Phoenix issues life insurance policies and is licensed to do so in Delaware and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 16 of the Complaint.

17.     The Trust admits that Mrs. Small and the Trust applied for a life insurance policy on Mrs. Small's life from Phoenix on or about December 22, 2006 and that the proposed owner

and beneficiary of the Policy was the Trust.  The Trust denies the remaining allegations of paragraph 17 of the Complaint and refers to the application for its complete contents.

18.     Denies the allegations of paragraph 18 of the Complaint and avers, based on information and belief, that:  (i) Phoenix did not rely on the answers stated on the Application; (ii) Phoenix did not consider these matters material to underwriting the Policy; (iii) all such answers were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust; and (iv) any claim by Phoenix based on purported misrepresentations is barred by the incontestability provision in the Policy, which is required by 18 *Del. C.* § 2908.

19.     Denies the allegations of paragraph 19 of the Complaint, refers to the Application for its complete contents, and avers, based on information and belief, that:  (i) Phoenix did not rely on the answers stated on the Application; (ii) Phoenix did not consider these matters material to underwriting the Policy; (iii) all such answers were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust; and (iv) any claim by Phoenix based on purported misrepresentations is barred by the incontestability provision in the Policy, which is required by 18 *Del. C.* § 2908.

20.     Denies the allegations of paragraph 20 of the Complaint, refers to the Application for its complete contents, and avers on information and belief that the answers in the Application were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust.

21.     Denies the allegations of paragraph 21 of the Complaint, refers to the Client Intent Form for its complete contents, and avers, based on information and belief, that:  (i) Phoenix did not rely on the answers stated on the Statement of Client Intent Form and did not attach it to the Policy when issued; (ii) Phoenix did not consider these matters material to underwriting the

Policy; (iii) all such answers were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust; and (iv) any claim by Phoenix based on purported misrepresentations is barred by the incontestability provision in the Policy, which is required by 18 *Del. C.* § 2908.

22.     Denies the allegations of paragraph 22 of the Complaint, refers to the Statement of Client Intent Form for its complete contents, and avers on information and belief that the answers in the Statement of Client Intent Form were supplied by Phoenix's own soliciting agents and were not provided by Mrs. Small or the Trust.

23.     Denies the allegations of paragraph 23 of the Complaint, except admits that Phoenix issued the $10,000,000 Policy to the Trust with a policy date of March 20, 2007 and refers to the Policy for its complete contents.

24.     Denies the allegations of paragraph 24 of the Complaint, except admits on information and belief that the first premium payment was made to Phoenix and that the Policy was delivered to the Trust in Delaware, and refers to the policy acceptance form for its complete contents.

25.     Denies the allegations of paragraph 25 of the Complaint to the extent directed at the Trust, denies knowledge or information sufficient to form a belief as to the remaining allegations, and avers that any misrepresentations were made by Phoenix's own agents.

26.     Denies the allegations of paragraph 26 of the Complaint to the extent directed at the Trust, denies knowledge or information sufficient to form a belief as to the remaining allegations, and avers that any misrepresentations were made by Phoenix's own agents.

27.     Denies the allegations of paragraph 27 of the Complaint.

28.     Denies the allegations of paragraph 28 of the Complaint.

29.     Denies the allegations of paragraph 29 of the Complaint.

30.     Denies the allegations of paragraph 30 of the Complaint.

31.     Denies the allegations of paragraph 31 of the Complaint.

32.     Denies the allegations of paragraph 32 of the Complaint.

33.     Denies the allegations of paragraph 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion to which no response is required.  To the extent that paragraph 34 makes factual allegations against Defendant, those allegations are denied.

## Count I

## Declaratory Judgment Lack Of Insurable Interest

35.     Repeats the above responses in paragraphs 1 through 34 and incorporates those responses herein by reference as if set forth at length.

36.     Denies the allegations of paragraph 36 of the Complaint.

37.     The Trust denies that Phoenix has fully and unconditionally tendered all premiums to the Court as it purports to do in paragraph 37 given that in the very next paragraph Phoenix seeks to retain the premiums, and avers, as set forth in its Counterclaims, that if Phoenix succeeds in rescinding the Policy and/or having it declared void, Phoenix will be obligated to refund all premiums both as a matter of Delaware law and pursuant to explicit language in Section 21 of the Policy providing that Phoenix must return all premiums, plus interest, in the event that it contests the Policy.

38.     Denies that Phoenix is entitled to retain any premiums and avers that if Phoenix succeeds in rescinding the Policy and/or having it declared void, Phoenix will be obligated to refund all premiums, plus interest.

## FIRST DEFENSE
## (FAILURE TO STATE A CLAIM)

39.     The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE
## (STATUTE OF LIMITATIONS)

40.     Phoenix's claim to rescind or void the Policy, and its claim to retain premiums, is barred by 10 *Del. C.* § 8106 because Phoenix brought this action more than three years after the Policy was issued.

## THIRD DEFENSE
## (INCONTESTABILITY)

41.     To the extent Phoenix's claims are predicated on alleged misrepresentations, they are barred by 18 *Del. C.* § 2908.

## FOURTH DEFENSE
## (UNCLEAN HANDS)

42.     The insurance agents who procured the Policy were agents of Phoenix.

43.     Phoenix is responsible for the acts of its agents that fall within the agents' actual or apparent authority, and cannot rescind, cancel or void the Policy which the agents procured, or otherwise deny benefits under that Policy, based upon acts of or knowledge by the agents.

44.     Phoenix's conduct in selling the Policy and other similar policies precludes it from seeking to rescind the Policy.

## FIFTH DEFENSE
## (WAIVER AND ESTOPPEL)

45.     Phoenix has waived its right to rescind the Policy because the allegations on which it seeks to rescind the Policy involve alleged acts done by its own agents in the application

process which it ratified by issuing the Policy.

46.     Phoenix should be estopped from seeking to rescind the Policy because the alleged acts upon which it seeks to rescind the Policy were either done by its own agents or with the agents' knowledge, which is imputed to Phoenix, and the Trust relied on the issuance of the Policy by Phoenix in its activities and in not seeking other insurance.

47.     Phoenix has waived its right to rescind, void, or invalidate the Policy, and/or should be estopped from doing so, because: (i) Phoenix waited an unreasonable and excessive period of time after learning of the purported facts and circumstances on which it later purported to contest the Policy; (ii) Phoenix continued to accept premium payments and treat the Policy as enforceable and in force after it had gained knowledge of its purported grounds for contesting the Policy; and (iii) Phoenix engaged in this unreasonable delay for its own financial reasons.

## SIXTH DEFENSE
## (INSURABLE INTEREST UNDER DELAWARE STATUTE)

48.     Under Delaware law, an insurable interest existed at policy inception and, therefore, Phoenix cannot rescind or cancel the Policy for lack of insurable interest.

## SEVENTH DEFENSE
## (OBLIGATION TO REFUND PREMIUMS)

49.     In the event that Phoenix succeeds in rescinding or voiding the Policy, Phoenix is required both by Delaware law and the terms of the Policy to return all premiums, plus interest, paid for the Policy to the Trust.

WHEREFORE, Defendant prays that the Court enter judgment ordering as follows:

A.      Dismissing the Complaint with prejudice and in its entirety;

B.      Adjudicating and declaring that Phoenix's purported rescission or cancellation of the Policy is unlawful and improper and that the Policy remains in full force

and effect;

C.      Granting Defendant its costs of suit, expenses, and attorney's fees expended and incurred herein, with post and pre-judgment interest; and

D.      Granting Defendant such other and further relief as the Court deems just and appropriate.

## COUNTERCLAIMS

50.     The counterclaims alleged below seek damages for breach of contract and declaratory relief related to a life insurance policy issued by PHL Variable Insurance Company ("Phoenix" or "Counterclaim-Defendant") (the "Policy") to the Helene Small Insurance Trust (the "Trust" or "Counterclaim-Plaintiff").

51.     From 2005 to 2007, Phoenix's core business was selling large face amount life insurance policies to elderly insureds, like Mrs. Small, who were likely to resell their policies to investors in the "secondary market."  Phoenix actively targeted this market and knowingly sold *billions* of dollars of such policies, thereby enriching its executives and sales force and enabling it to pay substantial dividends to its shareholders.  Recently, however, due to financial problems of its own creation, Phoenix has decided that it no longer is able or willing to honor the policies which were once its chief business.  Desperate to escape its obligations under such policies, Phoenix has taken several improper actions which are the subject of this action.  Specifically, here, Phoenix first breached the Policy and then, when it became clear its breach would be unsuccessful, improperly sought to void the Policy after having accepted six years worth of premiums for the Policy *and* to keep the premiums.

52.     In November 2011, Phoenix breached the Policy by improperly increasing the cost of insurance ("COI") charges that the Trust must pay under the Policy.  Phoenix took the

same impermissible action with respect to an entire block of its policies which it believed had been sold to investors in an effort to force Phoenix's policyholders to either allow their policies to lapse (thus earning Phoenix a windfall) or to pay excessive premiums which do not justify the face amount of their policies.  Numerous Phoenix policyholders responded by suing Phoenix over its improper actions.

53.     Once it became clear that Phoenix's policyholders would not quietly accept Phoenix's improper COI increases or allow their policies to lapse, Phoenix responded by ramping up another aspect of its attack on its own policyholders, which is attempting to rescind or void policies, and confiscate the premiums paid for such policies, based on the argument that the policies which were once Phoenix's core business – policies sold to elderly insureds who were likely to resell them – constitute so-called stranger originated life insurance ("STOLI") and are thus invalid.  Phoenix's attempt to void the Policy at issue here is part of Phoenix's larger pattern of improperly seeking to void policies and retain premiums in an effort to improve its poor financial situation.  Indeed, the same day that Phoenix filed this action, it also filed six other actions in this District alone seeking to void policies, and retain premiums for such policies, it had issued four, five, and even six years ago.  The policies Phoenix now seeks to void, and claims are unlawful STOLI, were not only knowingly issued by Phoenix but are the very same policies that Phoenix impermissibly increased the charges for only months ago.  PHL further breached the Policy by contesting the Policy while also repudiating its obligation to return premiums as explicitly promised in the Policy.

54.     As a result of Phoenix's misconduct, the Trust seeks (1) damages for Phoenix's breach of the Policy, based on Phoenix's improper COI increases and (2) a declaration that Phoenix's actions in seeking to rescind the Policy are improper, unlawful, and were done in bad

faith or, in the alternative, a declaration that in the event Phoenix succeeds in rescinding or voiding the Policy, Phoenix is obligated to return all premiums paid for the Policy to the Trust.

## THE PARTIES

55.     The Trust is a statutory trust created and organized pursuant to the laws of the State of Delaware and formed pursuant to the Delaware Statutory Trust Act, *12 Del. C.* §§ 3801, *et seq.*, with its principal place of business located at 500 Delaware Ave., Wilmington, DE 19801.  As a Delaware statutory trust, the Trust is a separate legal entity under 12 *Del. C.* § 3801(g) and is empowered under 12 *Del. C.* § 3804 to sue in its own name.  Helene Small established the Trust for the purpose of purchasing and maintaining a life insurance policy on her life.

56.     Upon information and belief, and based on its own Complaint, Phoenix is a corporation organized under the laws of the State of Connecticut, with its principal place of business located in Hartford, Connecticut.  Phoenix is licensed to do business in the State of Delaware.  Upon information and belief, Phoenix is a wholly owned subsidiary of PM Holdings, Inc., which is a wholly owned subsidiary of Phoenix Life Insurance Company (when discussing the general business activities of "Phoenix," these counterclaims refer to both PHL Variable Insurance Company and Phoenix Life Insurance Company, collectively, as "Phoenix"). Phoenix Life Insurance Company is a wholly owned subsidiary of the Phoenix Companies, Inc., which became a publicly traded entity in 2001 and trades under the symbol "PNX."

## JURISDICTION AND VENUE

57.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the complete diversity of citizenship between Counterclaim-Plaintiff and Counterclaim-

Defendant and because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

58.     This Court has personal jurisdiction over the Counterclaim-Defendant, as among other reasons, it issued insurance coverage in Delaware to a Delaware policy owner and beneficiary.  It also has made continuous and systematic contacts with Delaware, and is licensed as an insurer in the State of Delaware.

59.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred in this District and the Policy that is the subject of this action was issued in this District, such that the property that is the subject of this action is situated in this District.

## NATURE OF THE ACTION

60.     This action arises out of Phoenix's breach of a life insurance policy by improperly raising the Policy's COI charges and then, after doing so, attempting to rescind the Policy by alleging erroneously that such Policy constitutes purportedly improper STOLI when, in fact, Phoenix has attempted to rescind the Policy solely to avoid paying the $10,000,000 benefit due under the Policy and because of Phoenix's own dire financial situation – the same concerns which led Phoenix to breach the Policy in the first instance.

61.     The Policy was procured by Helene Small and issued to the Trust, which she established.  Thus the Policy complies with Delaware's insurable interest statute.  18 *Del. C.* § 2704.  Mrs. Small later, as was her right under Delaware law, which provides that life insurance policies are freely assignable, sold the beneficial interest in the Trust.  This sale was not part of any prearranged agreement before the Policy was issued but was rather an arms-length

transaction initiated and consummated by the parties after the Policy was issued.   Thus, Phoenix's claim that the Policy is void under Delaware law is incorrect.

62.    Phoenix's purported concern about the Policy being STOLI is not only factually incorrect, as described above, but it is contradicted by Phoenix's own actions.   Initially, Phoenix fully embraced the sale of policies to investors (the "secondary market" for policies), which it now criticizes and uses as a pretext for attempting to rescind policies.   For years, Phoenix issued policies it knew would be resold in the secondary market in order to boost its short term profits and actively encouraged its agents to seek out such business.   Phoenix also extensively marketed large face value policies to elderly insureds like Mrs. Small in order to collect as much premium income as possible as fast as possible.   It did so knowing that many such insureds were considering whether to sell their policies or interests in their policies to investors on the secondary market.   Phoenix's parent company also became an active buyer of policies on the secondary market and even formed a subsidiary dedicated to the purchase of policies on the secondary market.   Phoenix was thus an active, willing, and aggressive participant in the secondary market for years.

63.    One former employee has candidly admitted that: (i) as much as 80% of Phoenix's business was what Phoenix now denounces as STOLI; (ii) Phoenix's managers encouraged the solicitation of such business and taught employees how to find such business; and (iii) PNX's CEO would have had to have had a "learning disability" to not know that STOLI had become Phoenix's core business.   Another former employee has admitted that: (i) his compensation rose from $75,000 in 2004 to $1.8 million in 2006 as a result of the sale of policies Phoenix now denounces as STOLI; (ii) he generated as much premium revenue as some entire life insurance companies due to the sale of such policies; (iii) Phoenix implemented sales quotas

which were impossible to meet without selling such policies; and (iv) it "doesn't take a rocket scientist to figure out what was happening" in Phoenix's life insurance operations.   Phoenix succeeded in becoming a primary seller in the lucrative and burgeoning secondary market.

64.     Now, however, due to its own dire financial situation, and its concern that it will be unable to meet its contractual obligations as they become due and survive as a company, Phoenix has reversed its position regarding the secondary market, which it previously embraced, routinely denying coverage under policies or seeking to rescind policies its customers sold to investors on the pretextual ground that the policies it knowingly sold violate applicable insurable interest laws.   Phoenix has engaged in this practice not because of any legitimate concern regarding the policies, which it happily sold, but because it has found itself in significant financial trouble due to its involvement in substantial and reckless investments.   As a consequence of these problems of its own creation, Phoenix has been under intense pressure to expunge unprofitable, large face amount insurance policies from its books and to avoid paying claims on such policies.   Phoenix's changed financial circumstances, and not any legitimate concern regarding the Policy's legitimacy, motivated Phoenix's improper attempt to rescind the Policy in this case.

65.     As a result of its financial trouble, Phoenix has begun to "wage war" on investors who purchased Phoenix policies on the secondary market in an attempt to intimidate them into lapsing their policies (so that Phoenix can reap a windfall) or convince them to accept less than the full benefits promised by Phoenix in its policies.

66.     In an initial attempt to rid itself of its obligations to the Trust and other policyholders, without having to incur the costs of litigation, Phoenix unlawfully raised the COI rates for its policies.   It did so hoping that these increased rates would cause policyholders to

allow their policies to lapse, thus earning Phoenix a windfall by allowing it to retain all premiums paid for such policies without having any risk of having to pay death benefits.

67.     The Policy is a premium-adjustable, universal life insurance policy.  The principal benefit of such policies is that, unlike whole life insurance, universal life insurance allows the policyholder to pay the minimum amount of premiums necessary to keep the policy in-force; the premiums paid need only be sufficient to cover the COI charges and certain other specified expense charges.  Any premiums paid in excess of the COI charges and expense components are applied to a policy's "accumulated value" or "policy value," which earns interest.  Phoenix promoted these flexible-premium policies as "appropriate for those looking to minimize long term insurance costs" because they "present the opportunity to pay lower premiums, as well as adjust the amount and timing of premium payments."

68.     Having marketed such policies as enabling policyholders to minimize their premium payments and keep policy values as low as possible, Phoenix now is trying to punish the Trust and other policyholders for doing so.  Phoenix has drastically increased its COI rates where policyholders have exercised their contractual right to keep accumulated policy values low.  By increasing COI rates based on accumulated policy value, Phoenix is attempting to force the Trust and other policyholders to either pay excessive premiums which will not justify the death benefit or lapse their policies and forfeit the premiums to Phoenix.

69.     Additionally, the Policy expressly prohibits Phoenix from discriminating unfairly within any class of policyholders with respect to COI rates.  Yet, Phoenix has publicly admitted that its COI increases are directed only at a certain subset of policies within the same class.  This behavior by Phoenix is a breach of the express terms of the Policy.  Numerous Phoenix policyholders have sued Phoenix over its unlawful COI increases and at least one state insurance

department has ordered Phoenix to reverse its increases.

70.     As another part of its attacks on investors, and as a result of its own financial troubles, Phoenix has also begun to engage in a deceptive practice, sometimes called "post-issuance underwriting" with respect to policies it no longer views as profitable.  In other words, when it is actually called upon to pay a death benefit by a third party owner or otherwise concludes that a policy is unprofitable to it, Phoenix purports to "rescind" the policies unilaterally based on facts it was either aware of, or did not care about, at the time the policies were sold.  Such *post hoc* underwriting is universally recognized as constituting insurance "bad faith."  Phoenix's reputation for engaging in this unlawful conduct has become widely known in the insurance industry.  Indeed, the Wall Street Journal recently reported that while most life insurance companies deny less than one percent of death claims, Phoenix denies more than seven percent.

71.     As a further part of its attack on investors, Phoenix has begun filing rescission actions seeking to avoid policies it issued four, five, or even six years ago, and alleging that it should be entitled to keep the premiums which it happily collected for numerous years from those policyholders.  This misconduct by Phoenix is particularly egregious given that its policies expressly provide that it must return all premiums in the event that it contests a policy.  That is what Phoenix has done in this case.  After collecting premiums from the Trust for six years, Phoenix now belatedly contends that it was tricked into issuing the Policy and should not only be permitted to get out of the contract but should be able to keep the premiums.  This is not an isolated instance of bad faith on Phoenix's part.  Indeed, the same day it filed this action, Phoenix filed six other actions in this District alone seeking to rescind policies and keep the premiums.  Phoenix has filed numerous similar actions throughout the country.

72.     Phoenix's pattern of seeking to void policies and keep premiums has increased in recent months after it became clear to Phoenix that many of its policyholders would not be intimidated into lapsing their policies or accepting Phoenix's unlawful COI increases.  Indeed, in a brazen display of misconduct and in an effort to intimidate its policyholders, Phoenix has begun denying claims submitted by parties who previously challenged its unlawful COI increases as retaliation for those parties standing up against Phoenix's mistreatment of its policyholders.  Phoenix brought this action seeking to void the Policy only months after having unlawfully increased the COI charges for the Policy and after it became apparent to Phoenix that its COI increases were likely to be unsuccessful.

73.     By filing separate actions around the country seeking to rescind policies, Phoenix attempts to persuade courts that it was tricked into issuing the particular policy at issue, while hiding the vast scale of the policies Phoenix claims to have unknowingly issued.  But as set forth below, Phoenix was not tricked into doing anything.  The policies Phoenix now complains about in its various rescission actions were in fact Phoenix's core business for years.  Those policies were what enriched Phoenix's executives and sales force, and what made up the majority of Phoenix's business, and Phoenix cannot now claim with a straight face that it did not willingly, knowingly and happily issue policies it knew would potentially be sold to investors.

**Life Insurance Sold to Investors and the Eager Participation of Phoenix in that Market**

74.     For decades, the life insurance industry has had to pay out relatively few death claims because the majority of life insurance policies lapse (*i.e.*, the policy owner ceases paying premiums) before the insured's death.  This occurs because, after owning a policy for some amount of time, most insureds find themselves in a position in which they are no longer able – or no longer desire – to continue to pay premiums.  Before the development of the "secondary

market" for life insurance policies, such insureds were faced with little option and generally chose to surrender their insurance policy, thus relinquishing a potentially valuable asset for little or no payment from the insurer.  This state of affairs resulted in a tremendous windfall to insurers, as they were able to retain premiums paid by all policy owners while only infrequently paying out death benefits.

75.    The secondary market for life insurance policies developed as a direct response to this imbalance of power between insurers and their insureds that resulted in most insureds surrendering their policies, and thereby abandoning months – or years – of premiums previously paid to the insurer.  Investors who purchase insurance policies from insureds in the secondary market provide the insureds with the option of selling their insurance policies to the investor rather than simply surrendering the policy to the insurer.  According to a recent GAO report, policy owners who sold their policies on the secondary market received approximately eight times the cash surrender value that they could have otherwise received from their insurers.  Although some insurers, as a scare tactic, have characterized this secondary market for life insurance policies as "wagering on human life", the secondary market provides an important service to insureds who are now able to sell a valuable asset (their paid for insurance policy) rather than simply allowing the policy to lapse to the insurer's great benefit.

76.    Additionally, insureds often form insurance trusts for the purpose of owning insurance policies on their lives and name themselves or family members as the beneficiaries of such insurance trusts.  When policies are owned by insurance trusts, the insureds and their families also have the option of later selling their interests in those trusts, as opposed to the policies themselves, to investors on the secondary market if they wish.  That is what Helene Small did in this case.

77.    Although the secondary market for life insurance policies plainly benefits insureds, some life insurers have taken a negative view of the secondary market because of its perceived impact on historical life insurance policy lapse rates.  An investor who buys a policy on the secondary market or who purchases a policy directly from the insurer on an insured's life is unlikely to allow the policy to lapse.  Thus, when a policy is sold to an investor, the insurer is likely to have to pay the death benefit.  Insurers who dislike the secondary market dislike it because it ensures that they will have to do precisely what they promise in the insurance policies they issue – ultimately pay out insurance benefits for which they have received a premium.

78.    Upon information and belief, in or around 2004-2005, the life insurance industry began to experience significant growth in the marketing and sale of high face amount policies for high net worth elderly individuals.  Upon information and belief, this growth was largely attributable to the expansion in the secondary market for life insurance.  The knowledge that a policy could potentially be sold for a profit, rather than lapsed or surrendered to the insurance company, led many seniors to purchase policies as an investment that could potentially benefit their family if they decided they no longer wished to keep the policy.  That the increased demand for high face amount policies was driven by the secondary market was commented upon frequently within the insurance industry and was well known to all major life insurers.  That many insureds were forming trusts to own insurance policies on their lives, with the possibility that the beneficial interest in the trusts would later be sold, was also well known and frequently discussed in the insurance industry during this time as well.

79.    This increased demand for large face amount policies on the lives of seniors, which had a high possibility of later being sold to a third party on the secondary market, provided an opportunity for significant revenue for insurers wishing to sell such policies.

Because such policies were unlikely to lapse, however, certain insurers determined that they did not believe such policies would ultimately be profitable and decided not to sell such policies. Indeed, as early as 2005, certain life insurers had already developed pejorative terms, such as STOLI, to describe life insurance policies which they believed were being procured for the purpose of resale to investors.

80.    Other insurers, however, eager to obtain a share of the premium revenue from the increased demand for high face amount policies, actively embraced the secondary market and the transactions that led to this increased demand.  Phoenix was one of the companies which most eagerly embraced the new potential revenue available as a result of the secondary market.

### Phoenix's Sale of (and Purchase of) Life Insurance Policies as an Investment

81.    Upon information and belief, Phoenix was not actually concerned whether or not the policies it would issue were likely to be sold into the secondary market after issuance.  To the contrary, upon information and belief, because Phoenix wanted to increase its premium revenue, Phoenix actively solicited insurance agents and other producers to offer life insurance products that were likely to be sold into the secondary market.  Phoenix was concerned only with generating as much premium revenue as possible through the sale of expensive life insurance policies on the lives of elderly individuals.

82.    Upon information and belief, during the years prior to 2005, Phoenix's life insurance business had been on the decline.  Upon information and belief, Phoenix, in 2005, began a concerted effort to reverse this trend by attempting to become a leader in the sale of high face amount policies to wealthy, elderly insureds, which were likely to be sold to investors.

83.    During the time period from 2005 to 2007, Phoenix engaged in an aggressive campaign to sell high face amount policies to elderly insureds in order to generate high premium

revenue.  Upon information and belief, Phoenix even encouraged its agents to ask elderly insureds to purchase even larger policies than they had initially applied for so as to increase the premium revenue paid to Phoenix.  Upon information and belief, Phoenix's products were priced such, and issued in such large face amounts (often at Phoenix's urging), that resale of the policies was virtually inevitable.

84.    One former Phoenix employee, James Michael Max Labar, testified that although PNX's CEO sometimes made self-serving statements to shareholders that Phoenix was not selling so-called STOLI, "privately it was a different matter" as Phoenix's employees were told to "bring it on" and "crank it out."  Phoenix's regional sales managers encouraged employees to seek out so-called STOLI business from insurance agents, explaining "that's where you're going to make the money."  Employees who refused to participate in seeking out this business would either "fail," "leave" or "be fired."  Mr. Labar admitted under oath that approximately 80% of Phoenix's life insurance sales during the relevant time period were likely what Phoenix now calls STOLI and that this practice was so "blatant" that PNX's CEO and Phoenix's upper management would have had to have had a "learning disability" to not know that Phoenix's life insurance business was largely STOLI.

85.    The policies issued by Phoenix at the relevant time made clear its willingness to sell policies to insureds who planned to ultimately sell their policies into the secondary market. The policies issued by Phoenix specifically provided that the owner of the policy could (1) change ownership of the policy; (2) change the beneficiary of the policy; and (3) assign the policy.  Delaware's insurance code provides that policies can be freely assigned subject to restrictions in the insurance contract itself.  Phoenix chose not to restrict the sale of its policies, however, and even provided itself with a right of first refusal since it was also a buyer of policies

on the secondary market.

86.     Upon information and belief, as a result of Phoenix's embracement of the secondary market, its life insurance sales increased significantly in 2005.  Upon information and belief, Phoenix's sales of life insurance policies continued to expand dramatically into 2006, which Phoenix acknowledged was a direct result of it having accepted significant amounts of one form of business which it now characterizes as STOLI: namely, non-recourse premium financing.  The head of Phoenix's life insurance sales told employees that Phoenix's business philosophy with respect to policies sold pursuant to non-recourse premium financing was "the more the merrier." Phoenix even created a "user guide" related to non-recourse premium financing, which detailed different programs available so that its employees could best take advantage of this market.

87.     Even after many of its competitors denounced non-recourse premium financing as STOLI, Phoenix continued accepting such business and, even after deciding to stop accepting future non-recourse business, Phoenix "grandfathered" significant amounts of pending non-recourse business so as to be able to gain the significant premiums from the pending business and boost Phoenix's own financial position.  Although Phoenix ultimately ceased accepting non-recourse premium financing business, it continued to actively seek and accept other applications for policies which it believed were likely to be sold to investors.

88.     Phoenix's life insurance sales continued to increase dramatically in 2006 and 2007.  This increased business was directly tied to Phoenix's and its agents' heavy marketing and solicitation of business which Phoenix now claims was impermissible STOLI.  Upon information and belief, the majority of new premium revenue that Phoenix earned in 2005-2007 came from policies later sold to investors or owned by entities in which investors later purchased interests.

In several instances, Phoenix sold hundreds of millions of dollars of such policies through individual agents.  Phoenix sold many billions of dollars worth of policies it now characterizes as being STOLI.

89.     One of Phoenix's former employees, Ed Humphrey, testified regarding this explosion in sales created by Phoenix actively and aggressively selling policies destined to be sold on the secondary market.  Mr. Humphrey testified that he was required to meet a $2 million quota for premiums generated in 2005.  Due to Phoenix's marketing and solicitation of policies sold using non-recourse premium financing, Mr. Humphrey was able to generate $7.5 million in premiums, nearly four times his $2 million quota.   According to Mr. Humphrey's testimony, policies sold using non-recourse premium financing accounted for at least 90 percent of his business.  Phoenix raised Mr. Humphrey's quota to $8 million in premiums for 2006.  By continuing to bring in business which had all of the "earmarks" of policies which were likely to be sold into the secondary market, Mr. Humphrey alone generated *$36 million* in premium in 2006.  Mr. Humphrey's $36 million in premium was more than the total premium generated by several top 100 life insurance companies.  Phoenix raised Mr. Humphrey's premium quota to $20 million in 2007, which he met again.   As Mr. Humphrey explained, the quotas set by Phoenix for its employees were impossible to meet without selling policies intended to be sold in the secondary market (*i.e.*, policies Phoenix now denounces as STOLI).  As Mr. Humphrey aptly put it, it "doesn't take a rocket scientist to figure out what was happening" at Phoenix.

90.     Upon information and belief, in order to support its sales efforts in the senior market and maximize the issuance of high face value policies to seniors, Phoenix deliberately relaxed and disregarded its underwriting standards and requirements, and pressured its underwriters to approve policies, so that Phoenix could generate as much premium revenue as

possible.  Upon information and belief, Phoenix did not care about the accuracy of application information submitted by its agents, or about obtaining additional information or follow-up, because it was entirely indifferent to such information.  Rather, Phoenix cared only about receiving premiums by having policies approved and issued.  This "anything goes" underwriting philosophy by Phoenix extended not only to issues regarding the potential future sale of the policy (which Phoenix encouraged), but also to issues related to potential insureds' financial and medical status.  Indeed, Phoenix's "aggressive underwriting" was even commented on by financial analysts, who noted that Phoenix was likely approving policies its competitors would not in order to compensate for Phoenix's comparably low financial ratings.

91.    This consciously lax underwriting by Phoenix went hand-in-hand with its aggressive sales approach in the lucrative senior market.  An insurer who performs rigorous underwriting must reject a high percentage of applications and thus sacrifice short term profits for long term stability.  Phoenix had no interest in such an approach, as it cared only about generating significant premium revenue so that it could boost its short term profits, improve its financial ratings, and enrich its executives and sales force.  Its goal was to sell as many large policies as possible and this deliberately relaxed, permissive, and inattentive underwriting was an essential part of that strategy.

92.    Phoenix's underwriters either did not care about whether or not the policies being issued by Phoenix would later be sold on the secondary market, or they succumbed to Phoenix's marketing pressure and disregarded such information.  Phoenix's underwriters disregarded potential "red flags" that might have caused other insurers, who did not wish to participate in the market, to decline policies.  On information and belief, Phoenix's underwriters were under tremendous internal pressure to approve large policies and risked reprimand and possible

dismissal if they rejected a policy and thus cost Phoenix business or jeopardized their colleagues' bonuses and compensation. The guiding philosophy and goal was to earn as much premium revenue as possible. Phoenix's underwriters performed their jobs according to Phoenix's mission and strategy, approving policies regardless of any questions, concerns or red flags raised in the application file.

93. Largely due to Phoenix's success in selling policies which it now derides as STOLI, PNX was able to pay significant dividends to its shareholders during the relevant timeframe. Indeed, in each of the years from 2005-2007, it paid substantial dividends to its shareholders.

94. Phoenix's success in this market also enabled it to pay substantial bonuses to its executives and their sales force, and large commissions to its agents. For example, Ed Humphrey testified that, due to the sale of policies which were likely to be sold into the secondary market, his compensation rose from $75,000 in 2004 to $1.8 million in 2006. According to Mr. Humphrey, several other employees of Phoenix received annual compensation in excess of $1 million during the relevant period due to the sale of policies likely to be sold into the secondary market.

95. Phoenix's participation in the secondary market for life insurance extended beyond actively promoting and soliciting life insurance policies which it knew were likely to be sold to third parties on the secondary market. Indeed, its parent PNX became an active buyer and originator of policies on the secondary market. On or about April 1, 2008, PNX issued a press release stating in relevant part:

> HARTFORD, Conn. – (BUSINESS Wire) – April 1, 2008 – The
>
> Phoenix Companies, Inc. (NYSE: PNX) today announced that

through its subsidiary, Phoenix Life Solutions, it will enter the life

insurance settlements business with a focus on customer value and

full transparency on commissions and fees.

Phoenix Life Solutions will work with four prominent brokerage

general agencies (BGAs) across the country to originate life

settlements, or purchase unwanted or unneeded life insurance

policies from policy owners in exchange for an immediate cash

settlement…

96.     Phoenix even included a "right of first refusal" in its policies to facilitate buying

its own policies on the secondary market.   Phoenix's assertions regarding "wagering," in the

various rescission lawsuits it files, are hypocritical.   Phoenix significantly and knowingly

profited from the secondary market during the years in which the sale of policies likely to be

resold made up the core of Phoenix's business.

## Phoenix's Issuance of The Policy To The Trust

97.     On or about December 21, 2006, Helene Small established the Trust to own a life

insurance policy on her life, which she would procure.   Christiana Bank & Trust Company was

appointed to serve as the Trustee of the Trust.   On December 3, 2010, Christiana Bank & Trust

Company merged with Wilmington Savings Fund Society, FSB, which is now the successor-in-

interest to Christiana Bank & Trust Company as Trustee of the Trust.

98.     On or about December 22, 2006, an application for the life insurance policy to be

issued to the Trust (the "Application") was executed.   In the Application, Helene Small was

identified as the "Proposed Insured."   The Trust was identified in the Application as the owner of

the Policy.  The Trust was also identified as the sole beneficiary of the Policy in the Application.

Ms. Small executed the application and procured the Policy from Phoenix.

99.     In exchange for the agreement to pay premiums and other consideration, Phoenix

subsequently issued and delivered the Policy to the Trust.  The initial face amount of the Policy

is $10,000,000.  The Policy Specifications state that the "Owner, Beneficiary" is identified in the

Application, which listed the Trust as the proposed owner and beneficiary.  The Trust remains

both the Policy owner and beneficiary.  The Policy's "Issue Date" was March 20, 2007.

100.     Section 21 of the Policy expressly provides: "If we contest the validity of all or a

portion of the face amount provided under this policy, the amount we pay with respect to the

contested amount will be limited to the higher of a return of any paid premium required by us for

the contested face amount or the sum of any Monthly Deductions made under this policy for the

contested face amount."

101.     All premiums due under the Policy to date have been paid in accordance with the

terms of the Policy, and Counterclaim-Plaintiff has duly performed all other conditions of the

Policy on its part.

### Phoenix's Motivation to Wrongfully and Unjustifiably Attempt to Rescind the Policy

102.     Since issuing the Policy, Phoenix has found itself in substantially different

economic conditions.  These changed conditions, and Phoenix's desire to avoid paying death

benefits and thus further worsen its financial condition and to remove large policies from its

books so that it can reduce its reserves, and not any actual concern over the Policy's legitimacy,

are the impetus for Phoenix's purported rescission of the Policy.

103.     Phoenix and its parent PNX suffered significant financial losses during the 2008-

09 financial crisis.  They suffered a net loss of approximately $726 million in 2008; were

downgraded by the ratings agencies to "junk" bond range; were forced to fire a substantial portion of their workforce; and lost their biggest distributors in early 2009 (because they were no longer able to sell Phoenix products).  PNX's stock, which had traded at over $15 a share during much of 2007 plummeted to as low as 21 cents a share in 2009.

104.    Upon information and belief, the executives who were responsible for Phoenix's collapse were rewarded with generous severance packages worth tens of millions of dollars. This further weakened Phoenix's tenuous financial position.

105.    Because Phoenix is no longer attempting to sell large face value policies in the high net worth market, it apparently is no longer concerned with its reputation among distributors and consumers.  To address its financial concerns and lapse rate concerns, Phoenix has made a concerted effort to avoid having to honor the policies it issued which its customers later sold to investors on the secondary market.  Phoenix has made a concerted effort to avoid having to honor policies it issued where either the policy or a beneficial interest in a trust owning the policy was later sold to investors on the secondary market.  Although Phoenix willingly issued such policies when it served its interests to increase premium revenue, Phoenix now views such policies as unprofitable because the policies are not likely to lapse.  Upon information and belief, Phoenix has concluded that if the policies it issued do not lapse, and Phoenix were to pay death benefits when due, Phoenix's financial well-being would be threatened and Phoenix might become insolvent.  Phoenix has thus implemented a wide scale effort to avoid paying claims on the many billions of dollars worth of policies it issued which have since been sold on the secondary market and to confiscate the premiums paid for such policies and thus reap a financial windfall.

106.    As part of this strategy, in 2010 and again in 2011, Phoenix increased its COI

rates for a block of policies it believed were likely to have been sold to investors.  In its 10-K, Phoenix specifically admitted that this increase in prices was being made due to its belief that many of the policies in the block were what Phoenix considers STOLI.  By increasing the COI charges, Phoenix hoped to make the policies unprofitable to investors and force them to lapse their policies.  The problem for Phoenix is that the terms of its policies do not permit cost of insurance increases except for specifically defined circumstances which do not include Phoenix wishing to punish investors for buying its policies.  Therefore, on information and belief, the New York Insurance Department ordered Phoenix to reverse its impermissible rate increases and multiple lawsuits, including a class action, have been filed against Phoenix regarding Phoenix's improper COI increases.

107.    Because Phoenix's policyholders have not acquiesced to Phoenix's unlawful COI increases, Phoenix has ramped up another part of its strategy for avoiding paying claims on policies sold to investors, which is to deny claims for coverage in instances in which the policy or an interest in the policy owner has been sold and purport to rescind such policies, and other policies it views as being unprofitable, as being STOLI.  Upon information and belief, actually paying claims as promised in Phoenix's policies would present a significant strain on Phoenix's already dire financial situation.  Thus, apparently believing that desperate times call for desperate measures, Phoenix has, on information and belief, decided to reject claims for payments on large face amount policies owned by third parties as a routine matter and to accuse such policies of violating insurable interest laws in the hopes that it can avoid having to meet its contractual obligations.  It has also engaged in an effort to rid itself of other large policies which it views as being unprofitable, and the substantial reserves required for such policies, by purporting to rescind such policies as STOLI.  To increase the windfall to itself, Phoenix takes the position that

not only can it rescind policies years after they were issued but that it can also keep the premiums paid for the policies.

108.     Fighting for its own survival, Phoenix has desperately avoided having to pay any large claims which would further weaken its final position.  The *Wall Street Journal* recently reported that Phoenix now denies death claims (of all types) at a rate more than *seven* times higher than other life insurers.  As a result of these efforts, PNX only lost $12.6 million in 2010 and turned a modest profit in 2011.  Had Phoenix honored its contractual obligations and paid death benefits when due, its financial slide undoubtedly would have continued.

**Phoenix Breaches The Policy By Impermissibly Raising The Cost Of Insurance Rate**

109.     Prior to seeking to void the Policy, Phoenix breached the Policy by impermissibly raising the COI charges for the Policy.  This action by Phoenix was part of its plan to intimidate the Trust and other policyholders into lapsing their policies and thus earning Phoenix a windfall in being able to retain premiums with no risk of having to ultimately pay a death benefit.

110.     The Policy provides that it will remain in force as long as there are sufficient funds in the policy account to cover specific monthly deductions set forth in the Policy.  The most significant of these deductions is the COI charge, which reflects the price charged by Phoenix to cover the risk of paying the death benefit.  The COI charge is determined by multiplying the COI rate times the net amount at risk.

111.     The Policy allows Phoenix to change the COI rate, but only under very specific circumstances set forth therein.  Specifically, the Policy provides that changes in cost of insurance rates: (i) will be based on Phoenix's expectations of "future mortality, persistency, investment earnings, expense experience, capital reserve requirements and tax assumptions"; (ii) will "not discriminate unfairly within any class of insureds"; and (iii) "will not distribute past

-30-

gains or recoup prior losses."

112.    Therefore, under the express terms of the Policy, Phoenix may only change COI rates based on a change in its expectation of mortality, persistency and other specified factors. Additionally, any change in the COI rates must be made on a uniform basis for all insureds in the same class and cannot be used to recoup Phoenix's prior losses.

113.    The Policy's strict limitation on when COI rates may be increased is a material provision.  The Policy is a flexible-premium, universal life policy.  This type of policy provides significant flexibility to the policyholder.  A policyholder may choose to pay more into the account in premiums and accumulate tax-deferred interest.  Or, if a policyholder wants to invest funds elsewhere, the policyholder may choose to pay only enough to cover monthly policy charges.  If the COI rates could simply be increased whenever the insurer wished, the flexibility in premium payments which is the selling point of such policies would be wholly illusory.

114.    Phoenix marketed and sold its policies, including the Policy, as "flexible premium" policies, knowing that this flexibility would appeal to investors wishing to seek a competitive return on their investments and to avoid paying more premiums than needed to keep their policies in force.  Among other things, Phoenix represented that these policies: (i) give policyholders the "opportunity to lower premiums, as well as adjust the amount and timing of premium payments" (Press Release dated April 3, 2006); (ii) are "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business needs" (Press Release dated April 3, 2006); and (iii) are "appropriate to those looking to minimize long term insurance costs while seeking competitive returns" (Press Release dated June 19, 2003).

115.    Despite the explicit language in the Policy, and Phoenix's other policies, limiting

the circumstances under which the COI rates may be increased, and the fact that Phoenix heavily marketed such policies as permitting policyholders to pay the minimum premiums needed to keep their policies in force, Phoenix has twice unlawfully raised its COI rates, targeting the very policyholders who used Phoenix's policies in the way Phoenix designed and marketed them. Both increases were part of Phoenix's overall plan to force policyholders into allowing their policies to lapse; and the second unlawful increase breached the Policy.  Phoenix raised its COI rates in a targeted effort against policies it believed had become owned by investors, as investors frequently choose to pay only the minimum premiums required to keep a policy in force rather than attempting to build up the accumulated policy value.

116.    In March 2010, Phoenix began sending letters to a subset, but not all, of its universal life policyholders, announcing that a COI rate increase would affect their policies if their accumulated policy value was not high enough.  The letters stated in pertinent part:

> We are sending you this letter to inform you that on April 1, 2010, we are increasing cost of insurance rates on certain Phoenix Accumulator Universal Life policies.  Your policy referenced above will be subject to this rate increase on your next policy anniversary beginning 11/1/2010 unless your accumulated policy value is maintained at a sufficient level….The amount of the increase will vary based on the accumulated amount of your policy value.  In general, maintaining higher levels of policy value in relation to the face amount will reduce or even eliminate the increase.

117.    This first COI rate increase by Phoenix was unlawful in several respects.  First,

there is nothing in Phoenix's policies that allows it to increase COI rates based on the accumulated policy value. Indeed, the policies were marketed and purchased for the purpose of keeping the accumulated policy value low. Second, the COI rate increase was unlawful because it did not apply to an entire class of insureds, but only to those who maintain lower accumulated policy values. Third, the rate increase was unlawful because the life expectancies of insureds have increased, not decreased. COI rates are the rates that Phoenix charges to cover death benefits, and thus should properly be driven primarily by expectations of future mortality. Given that insureds are now living longer, Phoenix has no legitimate justification for raising costs intended to cover the risk of insureds' earlier death. Fourth, the COI rate increases were unlawful because they were, on information and belief, intended to recoup prior losses by Phoenix.

118.    In October 2011, Phoenix announced a second unlawful COI increase, which impacted and breached the Policy. Specifically, Phoenix sent a letter to the Trust on October 10, 2011 (and to certain other policyholders) stating that:

> We are sending you this letter to inform you that on November 1, 2011, we are increasing cost of insurance rates on certain Phoenix Accumulator Universal Life policies, including your policy referenced above…This change will go into effect on your next policy anniversary on or after November 1, 2011. As background, we review our cost of insurance rates periodically to determine whether they should be changed and take action only when the rates are too low or too high relative to our current actuarial and financial expectations related to the policies. This change is in

accordance with the terms of your policy, and all currently payable

rates for the cost of insurance remain below the maximum

guaranteed rate contained in your policy contract.

119.    Phoenix cannot raise COI rates based on "actuarial and financial expectations" as they are not listed in the Policy as permissible reasons for raising COI rates.  Moreover, on information and belief, the second COI increase was again based largely on the level of accumulated policy value.  Phoenix simply avoided stating what the increases were based on in an effort to make the increases appear legitimate.

120.    Further, the second COI increase, like the first, discriminates unfairly within the same class of insureds and was an improper effort to recoup prior losses by Phoenix.  Both increases are targeted at certain owners (namely policies which Phoenix believes have become investor-owned).  The COI rate increase does not affect thousands of other similar universal life policies, and Phoenix has not announced COI rate increases for other policies.  If Phoenix had in fact revised their actuarial or investment expectations, as they claim, the COI rate increases would have affected a broad range of policies, not an unspecified subset of universal policies.

121.    Phoenix's conduct with respect to the COI increases makes clear that it knows it is acting improperly.  Shrouding its actions in secrecy, Phoenix has refused to disclose the precise methodology used to calculate the COI rates, or even what those rates are.  Rather, in order to estimate the impact of the rate increases, policyholders have been forced to request illustrations for their respective policies.  Further recognizing that its behavior was improper, Phoenix warned its shareholders that its actions would likely result in litigation.  Phoenix 2010 Form 10-K at 12 ("Effective April 1, 2010 we implemented an increase in the cost of insurance rates for certain universal life policies [which] may adversely affect our relationships with

distributors, future sales and surrenders, and may result in claims against us by our policyholders.")

122.    Phoenix's goal in increasing COI rates was clearly to force policyholders into the unpalatable choice of either paying premiums which would no longer justify the death benefit under the policy or to lapse their policy and surrender all premiums to Phoenix.  These unlawful efforts appear to have been successful.  Phoenix announced during its second quarter 2010 conference call that it had seen an increase in policy lapses due to a number of factors, including the "cost of insurance rate increase we announced for a subset of policies in our product line."

123.    The COI rate increase was a breach of the Policy.  The Trust has been damaged by this breach in two distinct ways.  First, the Trust has been damaged because it is now being forced to pay larger premiums than required under the Policy.  Second, Phoenix's raising of the COI rates has significantly impaired the value of the Policy on the secondary market (even before Phoenix sued to void the Policy), as Phoenix has attempted to destroy one of the most valuable features of the Policy, which was the ability to only pay premiums necessary to keep the Policy in force.

124.    The Trust is not the only policyholder which has been forced to take action to protect itself against Phoenix's unlawful actions.  Several other lawsuits have been filed against Phoenix regarding its unlawful COI increases.  *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 11-CV-09517, United States District Court for the Central District of California, Western Division; *Martin Fleisher, as trustee of the Michael Moss Irrevocable Life Insurance Trust II, et al., v. Phoenix Life Insurance Company*, Case No. 11-CV-8405, United States District Court for the Southern District of New York; *Wilmington Savings Fund Society, FSB, as successor-in-interest to Christiana Bank & Trust Company, as trustee for*

*John Doe Trust 1, et al. v. PHL Variable Insurance Company, et al.*, (Case No. 12-cv-04926) (C.D. Cal. June 5, 2012).   Further, on information and belief, the New York Insurance Department has already ordered Phoenix to reverse the first of the unlawful COI increases.

125.   Rather than admitting its wrongful actions when confronted, and abiding by the terms of their policies with respect to COI rates, on information and belief, Phoenix has made a business decision to retaliate against those who have challenged their COI rate increases and who Phoenix believes reported its unlawful actions to regulatory authorities, by denying all claims submitted by any policyholders who have bravely stood up against Phoenix's unlawful actions. Indeed, at least two policyholders have already been forced to sue Phoenix for the death benefits under their policies, after PHL denied their claims in retaliation for having stood up against the COI rate increases.  *See U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-0347, United States District Court for the Central District of California, Western Division; *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-00877, United States District Court for the District of Minnesota.

126.   Phoenix brought this action approximately six months after breaching the Policy by improperly raising the COI charges.   It brought this action after COI litigation had been brought against Phoenix and after it had become apparent to Phoenix that its policyholders were not going to be intimidated into accepting Phoenix's unlawful actions.

### Phoenix's Wrongful and Unjustified Attempt to Rescind the Policy

127.   Phoenix filed this action on March 15, 2012 – six years after issuing the Policy – and did not previously contest the Policy.   Because Phoenix did not contest the Policy within three years its claim is barred by Delaware's statute of limitations.

128.   This action by Phoenix is part of its systematic plan to eliminate policies from its

books which it happily issued but now views as unprofitable.  In the various lawsuits Phoenix has filed seeking to void policies, it claims that the fact that the beneficial interest in the trust, or the policy itself, has been transferred means that the policy lacks a valid insurable interest.  By way of example, a partial list of lawsuits includes: *Alice Kramer v. Lockwood Pension Servs., Tall Tree Advisors Inc., Life Prods. Clearing LLC, Transam. Occidental Life Ins. Co., Phoenix Life Ins. Co., Lincoln Life & Annuity Co. of New York, and Jonathan Berck*, Case No. 08-CV-2429 (S.D.N.Y. May 29, 2008), Answer and Counterclaims; *Phoenix Life Insurance Co. v. The Irwin Levinson Insurance Trust II, and Jonathan Berck, as Successor Trustee*, Index No. 600985/2008 (N.Y. Sup. Ct. – N. Y. County); *PHL Variable Insurance Company v. U.S. Bank Nat'l Ass'n, et al.*, Case No. 10-cv-00197 (D. Minn. Apr. 8, 2010), Complaint; *PHL Variable Insurance Company v. 2008 Christa Joseph Irrevocable Trust*, Case No. 10-cv-03001 (D. Minn. Jul. 14, 2010), Complaint; *PHL Variable Insurance Company v. Jay Doss Irrevocable Life Insurance Trust*, Case No. HHD-CV-10-6017099-S (Conn. Superior Court, Hartford, November 23, 2010), Complaint; *PHL Variable Insurance Company v. Dolores C. Painter Irrevocable NJ Trust, et al.,* Case No. 10-cv-03603 (D.N.J. Jul. 16, 2010), Complaint; *PHL Variable Insurance Company v. LaSalle Bank N.A., et al,* Case No. 08-cv-11562 (E.D. Mich. Apr. 11, 2008), Complaint; *PHL Variable Insurance Company v. Clifton Wright Family Insurance Trust,* Case No. 09-C-2344 (S.D. Cal. Nov. 12, 2009), Complaint; *PHL Variable Insurance Company v. Kenneth Green Family Insurance Trust,* Case No. 09-cv-02606 (S.D. Cal. Nov. 18, 2009), Complaint; *PHL Variable Insurance Company v. The James Evans Family Insurance Trust,* Case No. 10-cv-00240 (S.D. Cal. Jan. 29, 2010), Complaint; *PHL Variable Insurance Company v. The Abrams Family Irrevocable Life Insurance Trust,* Case No. 10-CV-521 (S.D. Cal. March 11, 2010); *PHL Variable Insurance Company v. Kristian Giordano, et al.,* Case No. 10-cv-00661

(S.D. Cal. Mar. 26, 2010), Complaint; *PHL Variable Insurance Company v. Gabriel Giordano, et al.,* Case No. 10-cv-0071 (S.D. Cal. Apr. 13, 2010), Complaint; *PHL Variable Insurance Company v. The Hyman Davidson 2008 Irrevocable Life Insurance Trust,* Case No. 10-CV-1219 (S.D. Cal. June 8, 2010); Complaint; *PHL Variable Insurance Company v. The Patricia Sanford Family Insurance Trust, et al.,* Case No. 10-cv-00784 (S.D. Cal. Apr. 14, 2010), Complaint; *PHL Variable Insurance Company v. Alberto Rubio Family Insurance Trust, et al.,* Case No. 09-CV-4652 (C.D. Cal. June 26, 2009), Complaint; *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-0347, (C.D. Cal. Apr. 6, 2012); *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-00877, (D. Minn. Apr. 6, 2012).

129.   As a result of this widespread and systematic practice by Phoenix, sixty Phoenix policyholders recently brought claims against Phoenix for civil RICO, fraud, breach of contract, and declaratory relief related to the validity of their policies. *Wilmington Savings Fund Society, FSB, as successor-in-interest to Christiana Bank & Trust Company, as trustee for John Doe Trust 1, et al. v. PHL Variable Insurance Company, et al.*, (Case No. 2:12-cv-04926-SVW-AJWx) (C.D. Cal. June 5, 2012).   Similarly, as a result of this widespread and systematic practice by Phoenix, thirteen Phoenix policyholders recently brought claims against Phoenix for breach of contract, fraud, and declaratory relief related to the validity of their policies. *See* Counterclaims in *PHL Variable Insurance Company v. ESF QIF Trust*, Case No. 12-CV-00319, (D. Del. Mar. 15, 2012) [D.I. 8].

130.   Moreover, when attempting to rescind policies, Phoenix, as a matter of practice, has taken the position that it not only is entitled to deny claims and rescind coverage, but also that it is entitled to retain all premiums paid for the policies.   By taking that position, Phoenix is

directly breaching the terms of its policies.

131.    Section 21 of Phoenix's policies expressly provide: "If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the contested face amount or the sum of any Monthly Deductions made under this policy for the contested face amount."

132.    In other words, Phoenix contractually agreed, as an inducement to buying policies, that if it successfully contested a policy it would pay the policyholder back no less than all premiums paid for the policy.  Phoenix's consistent failure to honor the terms of their policies is willful and done in bad faith.

133.    Further, Phoenix's actions in refusing to return premiums when it seeks to void a policy, as it has done in this case, are directly contrary to Delaware law, which requires an insurer to return all premiums when a  policy is rescinded or declared void.

134.    Phoenix's attempt to void policies, like the one owned by the Trust, and keep premiums, has been done in bad faith and is hypocritical.  Phoenix actively and purposefully marketed, solicited, and encouraged the sale by its agents of life insurance policies for investment purposes and so-called STOLI to generate cash flow, premium income, and incentive compensation for Phoenix's senior officers.  These efforts were extremely successful.  Upon information and belief, during 2005-2007, the majority of business Phoenix received from its top agents consisted of what it now characterizes as being STOLI.  This was no accident but rather a result of a concerted effort of Phoenix's sales force to boost revenue.

135.    Upon information and belief, this action by Phoenix to rescind the Policy is not motivated by any interest in protecting the insured from investors having an interest in the early

death of the insured or concern about STOLI.  Upon information and belief, Phoenix's sole motivation in seeking to rescind this Policy and other policies sold to investors is to purge its inventory of policies held by owners who will not default on the premium payments or allow coverage to lapse and to avoid paying claims which will further weaken its already attenuated financial position.  This action to rescind a valid contract was motivated solely by pecuniary gain.  Upon information and belief, Phoenix's attempt to void the Policy after the fact constitutes improper retrospective underwriting done for illegitimate reasons related to Phoenix's financial condition.

136.    Phoenix's attempt to rescind or cancel the Policy is unjustified and unlawful.  The Policy issued to the Trust remains in full force and effect.  Further, in the event that Phoenix were successful in rescinding or voiding the Policy, both Delaware law and the terms of the Policy itself would require that it return all premiums to the Trust.  Its attempt to retain premiums, like its attempt to rescind, is thus unlawful and improper.

## COUNT I

## DECLARATORY JUDGMENT

137.    Counterclaim-Plaintiff the Trust realleges and incorporates by reference each of the allegations made at paragraphs 1 through 136, inclusive.

138.    This is a claim for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202. Counterclaim-Plaintiff seeks a judicial determination of the rights, duties and obligations of the parties with respect to an actual controversy arising in connection with the Policy.

139.    Phoenix in this action seeks to rescind the Policy by having it declared void *ab initio* for lack of an insurable interest.  Phoenix also seeks to retain all of the premiums it has received for the Policy even if it is successful in having the Policy declared void *ab initio*.

140.    The Trust seeks a declaration that there is no basis for rescission of the Policy and seeks to have it declared in full force and effect to provide insurance coverage on the life of Helene Small and to have Phoenix's actions in seeking to rescind the Policy declared improper, unlawful, and done in bad faith.  The Trust further seeks declarations that Phoenix's attempt to rescind or void the Policy is barred by the statute of limitations, that Phoenix has waived any right to rescind or void the Policy and/or is estopped from rescinding or voiding the Policy based on its own conduct, and that Phoenix's own unclean hands bar it from rescinding or voiding the Policy.

141.    The Trust also, in the alternative, seeks a declaration that if Phoenix is successful in rescinding or voiding the Policy, it must return all premiums paid for the Policy to the Trust, plus interest.  This declaration is required by Delaware law and the terms of the Policy.

142.    Accordingly, an actual case or controversy exists among the parties.

143.    A declaration that Phoenix is barred from challenging the Policy for the various reasons asserted by the Trust, that the Policy is enforceable, that Phoenix has acted improperly in seeking to rescind the Policy, and that Phoenix must return all premiums in the event the Policy is rescinded or declared void, is necessary and proper at this time in order that all parties may determine their rights and obligations among themselves.

## COUNT II

## BREACH OF CONTRACT

144.    Counterclaim-Plaintiff the Trust realleges and incorporates by reference each of the allegations made at paragraphs 1 through 143, inclusive.

145.    The Policy constitutes a valid and enforceable written contract between Phoenix and the Trust.  The Trust is the sole owner and beneficiary of the Policy.

146.   The Trust has complied with all applicable terms and conditions of the Policy including the timely payment of premiums due under the Policy to date.

147.   Phoenix's cost of insurance increase has materially breached the Policy in several respects.  First, Phoenix breached the Policy by increasing the cost of insurance rates based on a policy's accumulated value because accumulated value is not one of the permissible and enumerated bases for increasing the cost of insurance rates.  Second, Phoenix breached the Policy by increasing the cost of insurance rates based on a policy's accumulated value because such an increase does not apply uniformly to a class of insureds.  Third, Phoenix breached the Policy because its cost of insurance increases were not, on information and belief, based on the permissible factors stated in the Policy, such as expectations of future mortality and persistency.  Fourth, Phoenix breached the Policy because, on information and belief, the cost of insurance increases were impermissibly designed to recoup past losses.

148.   Phoenix has further breached the Policy by contesting the entire face amount of the Policy while refusing to return the premiums paid for the Policy in the event it is successful.  Section 21 of the Policy explicitly provides that Phoenix will, at a minimum, return all premiums in the event that it succeeds in contesting the Policy.  Phoenix has breached that contractual promise.

149.   As a result of Phoenix's material breaches of the Policy, the Trust has been damaged as alleged herein in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim-Plaintiff prays that the Court enter judgment ordering as follows:

A.   Granting Counterclaim-Plaintiff compensatory damages for Phoenix's breach of

contract, costs of suit, expenses, and attorneys' fees expended and incurred herein, with post and pre-judgment interest;

B.    Adjudicating and declaring that Phoenix's purported rescission or cancellation of the Policy is unlawful and improper, and/or is barred, and that the Policy remains valid and enforceable;

C    Adjudicating and declaring, in the alternative, that if Phoenix is successful in rescinding or voiding the Policy, Phoenix must return all premiums, plus interest, paid for the Policy to the Trust; and

D.    Granting Counterclaim-Plaintiff such other and further relief as the Court deems just and appropriate.


                                                    Respectfully submitted,

OF COUNSEL:                                          POTTER ANDERSON & CORROON LLP

John E. Failla                                       By:   /s/ John A. Sensing
Elise A. Yablonski                                        John E. James (No. 996)
Nathan Lander                                             David E. Moore (No. 3983)
PROSKAUER ROSE LLP                                       John A. Sensing (No. 5232)
11 Times Square                                          Hercules Plaza, 6th Floor
New York, New York 10036                                 1313 North Market Street
Tel:  (212) 969-3000                                     Wilmington, DE  19801
                                                         Tel.:  (302) 984-6018
                                                         jjames@potteranderson.com
                                                         dmoore@potteranderson.com
                                                         jsensing@potteranderson.com

                                                    *Attorneys for Defendant Helene Small
                                                    Insurance Trust, by and through its Trustee
                                                    Wilmington Savings Fund Society, FSB*

Dated: July 13, 2012

1067078 / 38946

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**<u>CERTIFICATE OF SERVICE</u>**

I, John A. Sensing, hereby certify that on July 13, 2012, the attached document was electronically filed with the Clerk of the Court using CM/ECF, which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

> Richard Douglas Heins
> Tiffany Geyer Lydon
> Ashby & Geddes
> 500 Delaware Avenue – 8th Floor
> Wilmington, DE  19801
> E-Mail:  rheins@asgby-geddes.com
>                tlydon@ashby-geddes.com
>
> *Attorneys for Plaintiff*

> */s/ John E. James*
> John E. James
> David E. Moore
> John A. Sensing
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza – Sixth Floor
> 1313 North Market Street
> Wilmington, DE  19801
> (302) 984-6000
> jjames@potteranderson.com
> dmoore@potteranderson.com
> jsensing@potteranderson.com